[Crim. No. 1570. Fourth Dist. July 3, 1961.]

THE PEOPLE, Respondent, v. MICHAEL AUGUSTUS BUFARALE, JR., Appellant.

* Assigned by Chairman of Judicial Council.

Monroe and Chula for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Respondent.

COUGHLIN, J.—The defendant was charged with the murder of Joan Marie Moore; after trial by jury was found guilty of murder in the second degree; and, following denial of his motion for a new trial, was sentenced to imprisonment in the state prison. From the judgment so entered, and from the order denying his motion for a new trial, he takes this appeal.

Joan Marie Moore was the wife of Sam E. Moore, a gunner's mate in the United States Navy; was the mother of three children; lived with her husband and children in National City until Mr. Moore went to sea in April 1959; thereafter met the defendant and started to live with him; and in July of that year, with the defendant and her three children, moved to Chicago, where they lived together until the middle of December, when she came back to California and took up residence with her parents in Garden Grove. The defendant returned to California in the early part of January, 1960; contacted Mrs. Moore; had intercourse with her; purchased some toys for her children; and appeared to be in a friendly mood toward her. Shortly thereafter, i.e., on January 13, 1960, Mr. Moore, who previously had returned from sea duty and found his wife and children missing, by prearrangement met her in Santa Ana; she told him that she had made a terrible mistake and proposed a reconciliation, to which he agreed. Later that month, apparently after learning of the proposed reconciliation, the defendant telephoned to and told Mr. Moore that he was the "guy" that Mrs. Moore went to Chicago with; wanted to know if they were going to get a divorce, and offered to pay for one; and said "She has really hurt me and I want to get even with her."

On a number of occasions the defendant made statements evidencing a desire or intent to kill Mrs. Moore; five witnesses

testified to such statements; these were made at various times, but most of them occurred within a few days of the time when he killed her; during some of them he upbraided her for her poor housekeeping and her neglect of the children while they were in Chicago; and in the course thereof, one moment he would call her vile names but in the next moment he would say he loved her. Two of the witnesses testified that they did not take these statements seriously as the defendant had said the same things about other women who had rejected him.

On February 6th, which was two days before the killing, the defendant took a knife from a collection of knives being shown to him by his roommate, stating that Mrs. Moore's father and brothers did not like him and he needed the knife for protection.

One witness testified that on February 7th the defendant told her, "You know, this might be the last time you will ever see me again," and when asked why, stated either "I think I will just go up there and kill her" or "I might go up there and kill her." Later this day the defendant borrowed an automobile for the purpose of going to Garden Grove to see Mrs. Moore, "to talk things over with her, and get things straightened out." One of the witnesses to the foregoing incident testified that he noticed a knife in the defendant's boot and suggested that he leave it with his roommate, whereupon the defendant said that "he might get in trouble or something, he was afraid of Joan's husband."

Early the next day, i.e., Monday, February 8th, the defendant telephoned Mrs. Moore, and her mother heard her say, "Mike, I am through with you. You are too lazy to work, you won't work, as long as I spend the money it is all right, but all you ever talk about is getting your father's money." Later the same morning, the defendant came to the mother's home and, over objection, insisted on talking to Mrs. Moore; upon assurance from the latter, was admitted; whereupon they conversed for some time, talking quietly; eventually he left, saying to the decedent's mother, "I am awfully sorry that I entered the house the way I did, but I don't imagine I will ever see you again." Shortly thereafter Mrs. Moore took her mother to work and on her return stopped at a gasoline station where the defendant again engaged her in conversation, at which time she agreed that he might come to her house for a further discussion. They were so occupied until a Mrs. Cathey called, pursuant to a prearrangement to accom-

pany Mrs. Moore to the El Toro Marine Base where the latter's two youngest children were to get a medical checkup. The defendant stated that the purpose of this visit was to persuade Mrs. Moore to live with him again and that at the time Mrs. Cathey arrived they "started seeing eye to eye." The two women and the children left and got into Mrs. Moore's automobile; Mrs. Moore drove; and Mrs. Cathey sat beside her, holding the 2-year-old child. The defendant followed them out of the house; got into his automobile and continued to follow them. As they proceeded toward the marine base, both cars were traveling between 45 and 50 miles per hour until they reached a point on Trabucco Road where the defendant forced the Moore automobile into the ditch, causing it to go into a spin and come to a stop; stopped his car; backed it up; got out; ran to the driver's side of the Moore automobile; opened the door; raised the knife which he had borrowed from his roommate, saying "I am sorry, Jo, but you asked for it," and thereupon stabbed her 30 or 40 times, causing as many stab wounds, 19 of which were in the left chest and 6 of which penetrated her heart and lung; death ensued instantaneously; and one of the medical witnesses testified that some of the stab wounds may have been inflicted after death. During the course of the assault Mrs. Moore struggled and screamed; her 3-year-old son, who was in the back seat of the car, struck at the defendant, as did Mrs. Cathey, who still was holding the 2-year-old child; Mrs. Cathey got out of the car and yelled for help; a marine captain responded to her call; upon his arrival the defendant still was stabbing Mrs. Moore; the captain shouted at him to stop; he looked up, stopped and got out of the car, saying, "It is all right. It is all over." Upon command from the captain the defendant dropped the knife; thereupon, returned to the Moore automobile; kissed the decedent; asked her not to die; and said to Mrs. Cathey, "I am sorry, Alma, but you will never know what she done to me." Mrs. Cathey said "Get away from here, haven't you done enough," and the defendant replied, "Shut your damn mouth."

Shortly after the stabbing, other witnesses arrived at the scene; one of them found an empty scabbard on the floor of defendant's automobile. The knife, apparently, for a time had been in the defendant's boot and later was placed by him on the seat of his automobile; it was a 10-inch stiletto, having a 6-inch blade with a ¾-inch maximum width. When questioned by some of the law enforcement officers, the defend-

ant admitted stabbing Mrs. Moore; said he did not know why he stabbed her; said that she was separated from a sailor and that he had been living with her for eight months; and denied that he had been drinking. Later he was interrogated by Orange County deputy sheriffs. All of the persons who saw the defendant from the time of the tragedy through the sheriff's interrogation testified, in substance, that he appeared to be calm and rational. At the trial, the defendant testified that he did not remember anything that happened during the course of the stabbing.

Additional testimony which was presented to the trial court will be noted hereafter as we consider the contentions of the defendant on this appeal which, as set forth in his topical index, are as follows:

(1) Error in admitting testimony respecting the defendant's relationship with Betty Peppmuller;

(2) Error in refusing testimony relative to the factual background reflecting the mental and emotional condition of the defendant;

(3) Error in refusing instructions on voluntary and involuntary manslaughter; and

(4) Error in the giving of instructions as hereinafter noted.

## PEPPMULLER TESTIMONY

The court admitted in evidence testimony which, if accepted by the jury, showed that the defendant on three occasions in 1958 had dated a married woman named Peppmuller, who was the mother of two children; that he wanted to marry her; that on one occasion he told her that if she did not go straight home she never would drive a car again; that he was jealous of her dancing with other men; that he rented an apartment near hers and told the landlady that he loved his sweetheart "so dearly that if she had stepped out on him he would have killed her . . . he would kill her dead"; that he telephoned her during the time he was living in Chicago with Mrs. Moore; that, when asked why he did not leave Mrs. Peppmuller alone, he said he was going to get her away from her husband; and that, when she rejected his attentions, he telephoned to and told Mr. Peppmuller that he had had intercourse with Mrs. Peppmuller and, upon her denial, attempted to prove this to be the fact. The defendant contends that this evidence was inadmissible because it tended to connect him with other offenses and to degrade him. Without objection the evidence also showed that, on the evening of February 6th, the defend-

ant, in the presence of his roommate, telephoned a woman named Betty; subsequently related his telephone conversation to his roommate, saying that Betty had told him she had gone back to her husband; and added that he ''should go down there and stomp the hell out of her and her old man both.'' The court instructed the jury that the testimony in question was offered for the purpose of showing that the defendant had threatened to kill Mrs. Peppmuller and had informed her husband of her alleged misconduct; that it was not admitted to prove that he was the kind of a person who would be more likely to commit the crime charged in the information, but only for such bearing as it might have on the question whether he was innocent or guilty of that crime; and that the value, if any, of such evidence depended upon whether it tended to show his state of mind at the time of the commission of the alleged crime, that he had a motive for its commission or that he entertained the specific intent or the malice aforethought which are necessary elements of the alleged crime, or the deliberation and premeditation which are necessary elements of murder in the first degree.

The testimony objected to properly was admitted and considered under the principles reiterated and applied in *People* v. *Peete,* 28 Cal.2d 306, 314 [169 P.2d 924]; *People* v. *Wells,* 33 Cal.2d 330, 340-343 [202 P.2d 53]; *People* v. *Citrino,* 46 Cal.2d 284, 288 [294 P.2d 32]; *People* v. *Moore,* 48 Cal.2d 541, 546 [310 P.2d 969]; it was pertinent to the issues of malice aforethought, intent and premeditation. The relationship between the defendant and Mrs. Peppmuller was similar to his relationship with Mrs. Moore, the deceased; in each case he had been rejected, made threats and retaliated. The jury was entitled to conclude that his retaliatory state of mind, occurring under similar circumstances, was the same in both instances; to find that his actions toward Mrs. Peppmuller were conscious, intentional, wrongful and malicious; and to infer that his actions toward Mrs. Moore, likewise, were conscious, intentional, revengeful and malicious. The defendant contends that when he stabbed Mrs. Moore to death, he was not conscious of what he was doing. His previous retaliatory actions under similar circumstances belie this contention. The People contend that the defendant acted out of a spirit of vengeance; that such action constituted malice aforethought; and that the inferences deducible from the evidence in question support this contention. Evidence of a defendant's prior misconduct may be admissible where it

tends to show that he is guilty of the crime charged "by showing a peculiar or characteristic behavior pattern" manifested by his conduct in both instances. (*People* v. *Cavanaugh,* 44 Cal.2d 252, 265-266 [282 P.2d 53].) The evidence in question meets these requirements.

### EVIDENCE RE MENTAL AND EMOTIONAL BACKGROUND

The defendant's eldest sister was called as a witness on his behalf; testified that his father ordered him to leave home after the death of his mother in 1954; and was asked to describe the relationship between the defendant and his mother, but an objection to the admission of such evidence was sustained on the ground that it was too remote. In a discussion which followed, the trial court judge said:

"I will permit you to introduce as part of the history taken by the expert witnesses anything that they deemed important. To leave it to a lay jury and a lay witness as to his action years and years ago, the objection is sustained."

In substance, the defendant desired to have his sister testify to those facts which a psychiatrist witness subsequently called would state she had related to him, and offered "to prove the history that the psychiatrist will recite as given to him." With respect to this offer, the trial judge observed: "I can see no objection to that" although, after further discussion, he indicated that any testimony in this regard should not be too remote. However, the attorney for the defendant withdrew the witness he was interrogating and did not pursue the matter further. Subsequently a psychologist and five psychiatrists were called as witnesses; three of these testified to matters related to them by the defendant's sisters concerning his background. No effort thereafter was made to call any of these sisters as witnesses and elicit from them testimony reiterative of their statements to the psychologist or the psychiatrists. No error can be attributed to the action of the trial court in the light of this indefinite state of the record.

There was no error in sustaining the objection to the original question upon the ground that the evidence solicited thereby, which concerned events occurring six or more years prior to the time of trial, was too remote. (*People* v. *Hardenbrook,* 48 Cal.2d 345, 352 [309 P.2d 424].)

### REFUSAL TO INSTRUCT ON MANSLAUGHTER

The defendant requested, but the trial court refused, four standard instructions covering both voluntary and

involuntary manslaughter. This refusal is assigned as error.

 Where the evidence in a murder case is such as would warrant a conviction for manslaughter, it is error to refuse to instruct upon this issue (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281]), but if the evidence does not warrant such a conviction, instructions thereon may be refused. (*People* v. *Mitchell,* 14 Cal.2d 237, 241 [93 P.2d 121] ; *People* v. *Alcalde,* 24 Cal.2d 177, 188 [148 P.2d 627] ; *People* v. *Sutic,* 41 Cal.2d 483, 494 [261 P.2d 241] ; *People* v. *Zilbauer,* 44 Cal. 2d 43, 49 [279 P.2d 534].)

 In substance, the defendant contends that he was incapable of committing murder because he was incapable of entertaining malice aforethought; that his actions in killing Mrs. Moore were not the result of his thinking processes but the result of his emotions, over which he had no control; that this conclusion is supported by the testimony of the psychologist and the psychiatrists; that the killing occurred in the heat of passion because it was the result of an emotional imbalance arising from his love for and rejection by the decedent, or that death was the unintentional result of his having a knife with him for the purpose of threatening her; and, if the killing in question was unlawful, under the evidence it only could have been manslaughter.

The testimony of the psychologist and the psychiatrists indicated that in their opinion the defendant acted impulsively and was not able to plan a lot of his behavior, "particularly when the stress factors are involved"; that his act of stabbing was the result of his emotional outgoing rather than his thought processes; that he did not have an awareness of what he was doing; that his actions were "under control of the influence of his unconscious mind"; that he had a tendency toward unthoughtout activity; and that he was not capable of malice aforethought. On the other hand, one of these psychiatrists testified that the defendant had a feeling of enmity toward the deceased, which built up over a long period of time, and "triggered" or was one of the contributing causes of the killing.

If the defendant's act of killing Mrs. Moore was an unconscious act, he was not guilty either of murder or manslaughter. (*People* v. *Danielly,* 33 Cal.2d 362, 376 [202 P.2d 18] ; *People* v. *Gibson,* 92 Cal.App.2d 55, 70 [206 P.2d 375].) The trial court gave appropriate instructions to this effect. Nevertheless, by its verdict, the jury impliedly found that in stabbing Mrs. Moore, the defendant was conscious of what he was

doing and acted with malice aforethought; found against his contentions that his actions were under the control of his unconscious mind, i.e., that he did not know what he was doing; and rejected any testimony supporting a conclusion that he did not act with malice aforethought.

The evidence overwhelmingly establishes the existence of malice aforethought as that term is defined by the Penal Code, i.e.,

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)

Even though a deliberate intention to kill is absent, if "no considerable provocation appears" or "the circumstances attending the killing show an abandoned and malignant heart," malice will be implied. (*People* v. *Valentine,* 28 Cal.2d 121, 131 [169 P.2d 1]; *People* v. *Mears,* 142 Cal. App.2d 198, 204 [298 P.2d 40].) In the case at bar the element of implied malice prerequisite to the offense of murder in the second degree was established by proof of the vicious and brutal manner of the killing (*People* v. *Tubby,* 34 Cal.2d 72, 75-79 [207 P.2d 51]; *People* v. *Fleming,* 218 Cal. 300, 311-312 [23 P.2d 28]; *People* v. *Munn,* 65 Cal. 211 [3 P. 650]; *People* v. *Ogg,* 159 Cal.App.2d 38, 50 [323 P.2d 117]); of the defendant's many previous threats upon the life of the deceased (*People* v. *Chaves,* 122 Cal. 134, 143 [54 P. 596]; *People* v. *Narron,* 120 Cal.App.2d 766 [261 P.2d 769]); of his declaration to her husband that she had hurt him and he wanted to get even with her (*People* v. *Fleming, supra,* 218 Cal. 300, 309); and of his demonstrated desire for revenge against women who had rejected him.

Relying on the general definition that voluntary manslaughter is the unlawful killing of a human being without malice, upon a sudden quarrel or heat of passion such as naturally would arise in the mind of an ordinarily reasonable person under the circumstances (Pen. Code, § 192; *People* v. *Gorshen,* 51 Cal.2d 716, 731 [336 P.2d 492]; *People* v. *Valentine, supra,* 28 Cal.2d 121, 137), the defendant contends that the refusal to instruct on this offense was error because the psychologist's and psychiatrists' testimony admitted in evidence, if accepted by the jury, would have established that in

562

killing Mrs. Moore he was acting under the heat of passion. The trial court concluded, as a matter of law, that the killing in question was not upon the heat of passion. We concur in this conclusion. At the most, the expert testimony relied upon would establish only that the defendant's actions were in response to his emotions and not his thought processes. This emotional impetus, even though existing and building up over a period of time, would not constitute the heat of passion which displaces the malice ordinarily implied from such a killing. The defendant did not claim, either in the several statements made by him before trial or in his testimony at the time of trial, that he killed Mrs. Moore as the result of a quarrel or in the heat of passion, rather, he always has contended that he has no memory of the stabbing, i.e., that his actions at that time were not the result of his conscious mind.

■ ''Mere unrestrained and unprovoked rage, or a 'heat of passion' to wreak vengeance, of a legally sane although emotionally unstable or nervous person is no defense to homicide.'' (*People* v. *Danielly, supra,* 33 Cal.2d 362, 377.)

The defendant testified and the evidence establishes that he and the decedent were not engaged in a quarrel or were not angry when they left her house on the morning in question. It is obvious that his act was one of vengeance. The provocative factor involved was Mrs. Moore's rejection of defendant's continued attentions and her decision to live with her husband; this occurred many days previous to the killing and, as a matter of law, did not constitute legal cause for the ''heat of passion'' which will reduce an unlawful killing from murder to manslaughter. (*People* v. *Arnold,* 116 Cal. 682, 685 [48 P. 803]; *People* v. *Ashland,* 20 Cal.App. 168, 174 [128 P. 798]; see *People* v. *Wells,* 10 Cal.2d 610, 618 [76 P.2d 493].)

■ In support of his position that the court should have given instructions on the issue of involuntary manslaughter, the defendant contends that the evidence would support a contention that ''death may have been an unintentional result of the defendant having the knife with him for the purpose of threatening the decedent and the jury had the right to determine whether the position the defendant placed himself with said weapon in the presense [*sic*] of the decedent was an act done with due caution or circumspection. . . .'' The defendant ran the Moore automobile off the highway; picked up the knife which was lying on the seat next to

him; ran back to the decedent's car; opened the door; stabbed her 30 or 40 times while others were trying to stop him; and said "I am sorry, Jo, but you asked for it." A mere recital of these events, without attempting specifically to relate them to the various elements of involuntary manslaughter, establishes the propriety of the court's refusal to instruct on that offense. The defendant committed an assault upon the decedent with a deadly weapon, resulting in her death; he threatened her and carried out his threats by killing her; and any conclusion to the contrary which might bring his actions within the realm of involuntary manslaughter involves rank speculation. (See *People* v. *Watkins,* 178 Cal.App.2d 41, 44 [2 Cal. Rptr. 707].)

If the defendant was guilty at all, he was guilty of murder in the first or second degree. Under these circumstances, the refusal to give instructions upon the offense of manslaughter was proper. (*People* v. *Alcalde, supra,* 24 Cal. 2d 177, 188; *People* v. *Shannon,* 203 Cal. 139, 143 [263 P. 522]; *People* v. *Watts,* 198 Cal. 776, 793 [247 P. 884]; *People* v. *Lapara,* 181 Cal. 66, 73 [183 P. 545]; *People* v. *Chaves, supra,* 122 Cal. 134, 140; *People* v. *Chavez,* 103 Cal. 407, 408 [37 P. 389]; *People* v. *Stembridge,* 99 Cal.App.2d 15, 21 [221 P.2d 212].)

## Other Instructions

The defendant also contends that the court erred in giving other instructions but presents neither argument nor citation in support of his contention. Nevertheless, we have examined these instructions and find them to be proper under the circumstances. Three of them involve the issue of criminal intent; the first thereof was criticised in *People* v. *Gorshen, supra,* 51 Cal.2d 716, 728-729, as "of little aid in appraising either general or specific intent" and as "not very enlightening," but the giving thereof was not erroneous; a second directed the jury's attention to the purpose for which evidence respecting the defendant's "abnormal or nervous condition" was to be considered, i.e., whether at the time of the act charged there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime, and thus followed the concepts set forth in *People* v. *Wells, supra,* 33 Cal.2d 330, 343 and *People* v. *Gorshen, supra,* 51 Cal.2d 716; a portion of the second instruction advised the jury that neither emotional, moral nor partial insanity is a defense or an excuse for the

commission of a homicide, which was a recognition of the distinction noted in *People* v. *Nash,* 52 Cal.2d 36 [338 P.2d 416] and, as such should have been omitted from a consideration of the issues in this case, which did not concern those raised by a plea of not guilty by reason of insanity, but the giving thereof was not prejudicial to the defendant's case (see *People* v. *Cook,* 15 Cal.2d 507, 518 [102 P.2d 752], for the applicable rule), and in the light of other instructions could not have been confusing; the jury was told in substance, that it should consider evidence of the defendant's abnormal mental and nervous condition in determining whether he possessed the required mental state which was an element of the crime charged, and also was told that an act is not criminal if it is one occurring when "there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious mind," which followed the defense theory of the case; the third instruction related and applied the presumption that a person intends the ordinary, natural and probable consequence of the voluntary use of a dangerous weapon without excuse or provocation and in such a manner as to imperil life, advised that such presumption could be overcome by any evidence sufficient to create a reasonable doubt respecting such intent, and was appropriate to the evidence in this case. (*People* v. *Cook, supra,* 15 Cal.2d 507, 517.)

Objection also is made to an instruction in form and substance approved in *People* v. *Grasso,* 142 Cal.App.2d 407, 413 [298 P.2d 131]. Particular stress is laid upon that part of the instruction advising the jury that there was no contention made by the defendant that the killing of Mrs. Moore was excusable or justifiable homicide. In truth, the defendant made no such contention at the trial; he did not request any instructions on the subject; and the evidence would not support such a finding. (See *People* v. *Dugger,* 179 Cal.App.2d 714, 722 [4 Cal.Rptr. 388] ; *People* v. *Stembridge, supra,* 99 Cal.App.2d 15, 22.) The objection is without merit.

Our review of the entire record in this case, including the evidence, leads us to the conclusion that the defendant received a fair trial; that no error occurred in the admission or rejection of evidence; that proper instructions were given; and that in rendering a verdict of murder in the second degree, the jury gave due consideration to the testimony of the psychologist and the psychiatrists, being willing to find that the defendant did not possess that state of mind essential to a deliberate and premeditated act, but possessing that state of

mind competent to entertain malice aforethought. (*People* v. *Gorshen, supra,* 51 Cal.2d 716, 735.)

The judgment and order denying the motion for a new trial are affirmed.

Griffin, P. J., and Shepard, J., concurred.