[No. A036153. First Dist., Div. Three. Mar. 9, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DUANE ALLEN WILLIAMS, Defendant and Appellant.

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Joan Y. Nosse, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MERRILL, J.**—Appellant Duane Allen Williams was convicted by a jury of one count of attempted murder (Pen. Code,[1] § 187) with a finding that he personally used a firearm (§§ 12022.5 and 1203.06, subd. (a)) and inflicted great bodily injury (§§ 12022.7 and 1203.075), and one count of being an ex-felon in possession of a firearm (§ 12021). Additionally, appellant admitted three prior felony convictions, two of which resulted in his serving prison terms. Appellant was sentenced to the upper base term of nine years on the attempted murder count, enhanced by three years for the great bodily injury finding and one year for each of the prior prison terms served for an aggregate sentence of fourteen years. An eight-month sentence on the ex-felon in possession of a firearm count was stayed. This appeal followed.

I

In the early morning hours of December 23, 1983, San Leandro Police Sergeant Timothy Harper was returning to the police station in his patrol car when he spotted a man standing alone near some newspaper racks in a shopping center. There were no cars in the area and the man looked somewhat upset upon seeing Harper's patrol car. Because it was 2:45 a.m. and the racks had been broken into before, Harper thought he should investigate.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Harper circled the block until he reached the south entrance of the shopping center. The man he had seen was gone. However, upon checking the racks it appeared to Harper that the Tribune dispenser had been tampered with by someone. There were marks on the door and the door would not lock.

Officer Harper then drove back to the south side of the center whereupon he saw the man he had seen earlier. He stopped his car and got out and approached the man indicating that he would like to talk to him. Harper noticed that the man had a Tribune in his hand and asked him if he had purchased it. The man became agitated at this insisting that he had purchased it and proceeded to pull out a quarter from his coat pocket to prove it. Harper thought this was "extremely unusual" since the newspaper racks did not give change. As the man pulled out the quarter, Harper observed the handle of a screwdriver inside the man's pocket. Upon seeing the screwdriver, Harper became concerned for his own safety and decided to conduct a pat-search of the man. Harper told the man to put the newspaper on the hood of the patrol car. The man failed to follow the officer's directions, however, and handed him the newspaper instead. Harper next ordered the man to put his hands on top of his head. Again, the man refused to follow the officer's directions. With his right hand in his pocket, the man proceeded to back away from the officer.

At this point, Harper grabbed the man's right arm and a struggle ensued during which the officer's right shoulder was dislocated. Harper next heard a gunshot and felt pain in his left collarbone. As he started to fall to the ground, he was shot again in the left shoulder. Harper looked up and saw the man in flight. Though he felt "pretty helpless," the officer managed to pull his gun out of his holster with his left hand and release the safety. He then rolled in the direction where he last saw his assailant and saw the man walking back toward him with his "arm extended like he was going to shoot . . . ." The man turned and ran, however, when Harper pointed his weapon and fired.

Using his portable radio, Harper radioed for assistance, describing his assailant in detail. According to Harper, the assailant was a Mexican male, about five feet eight inches tall, wearing a hat and a tan coat and armed with a firearm. Harper said the man wore a backpack during the confrontation. Later, at the hospital, the officer added to the description the fact that the man wore a glove on his left hand.

Harper was taken to San Leandro Memorial Hospital where he was treated for two bullet wounds, one located in the officer's shoulder, the other in his neck. One of the bullets had pierced the officer's left artery and

vein. Surgery was performed to repair the damage, but it was necessary to permanently tie off the left artery. The bullet removed from Harper's neck was a .22-caliber bullet.

On the morning of the shooting, a San Leandro resident noticed an "odd color" car pull up in front of a neighboring house. The car did not belong to any of the neighbors and was without a front license plate. The resident witnessed the driver of the car, a man of medium build wearing a tan jacket, exit the vehicle and walk down the middle of the street. After walking about 100 yards, the driver crossed over to a sidewalk. Thinking that something was amiss, the resident called the police and reported what he had seen.

At about the same time, the police received a telephone call from another resident of the same neighborhood. This caller reported seeing a man walking along the same road at a "fairly fast gait." The man disappeared into some shrubbery and reemerged in 10 to 15 seconds.

Officer Robert Seeley was driving away from the scene of the shooting when he heard a report over police radio describing the man and the vehicle which had been observed by the residents. Shortly thereafter, Seeley spotted a car matching the description and followed it in his unmarked patrol car. Seeley followed the suspect vehicle to an intersection where another patrol car appeared and blocked the subject vehicle. The driver of the suspect car was appellant. In the back seat of the vehicle, the officers found the owner of the car, a young woman passenger by the name of Denise Jacobs.

In a pat-down search for weapons, the officers discovered a live round of .22-caliber ammunition in the pocket of the tan jacket worn by appellant at the time. Inside the car, they found a glove, a backpack, and another live .22-caliber bullet. These items, including the jacket, were seized by police.

On the afternoon of the shooting, Officer Harper who was awaiting surgery in the hospital, was asked to view six photographs. One of the photographs was of appellant. Harper was unable to identify anyone in the photographs as the man who shot him. According to Detective Kenneth Mordoff, Harper's answers were slow and his responses depressed at this time. Shortly thereafter, Harper was operated on for the dysfunction in his left artery.

On January 11, 1984, Harper was asked to view a lineup at the Santa Rita jail. He was recovering from surgery but was not on any medication. Harper positively identified appellant as the man who shot him.

At trial before a jury, the following additional facts were adduced: After appellant's arrest, the police found traces of gunshot residue on the backs of

his hands. Additionally, the police discovered a flake of unburned gunpowder in the right pocket of appellant's jacket which resembled some gunpowder residue recovered from Officer Harper's jacket. Both sets of residue were consistent with the powder in the .22 caliber rounds seized at the time of appellant's arrest. Furthermore, the bullets seized by the police appeared to be the same type and of the same manufacturer as that removed from Harper's body.

Denise Jacobs testified that on the evening of December 22 she drove to appellant's house. She and appellant then went to a bar together and from there to another location where appellant picked up a gun. In the early morning of the 23d, Jacobs dropped appellant off in a residential area of San Leandro. Appellant told Jacobs he was going "to get some money" from a coin machine or from a friend and to wait for him. Jacobs waited a while then drove back to appellant's home. Not finding appellant at home, Jacobs went to sleep in her car. She was later awakened by appellant kicking the door of the car and swearing at her for leaving him. Appellant told Jacobs that he had got into some trouble and had had to shoot a cop. He had to shoot him, he said, because the officer was "after him."

Officer Harper verified the identity of appellant as his assailant. He also identified the jacket, backpack and glove seized by police as the ones worn by his assailant on the night of the shooting.

## II

In its instructions to the jury, the trial court delineated the requisite elements for attempted murder and the lesser included offenses of assault on a police officer with a handgun, and battery. It refused defense counsel's request, however, for an instruction on the lesser included offense of attempted voluntary manslaughter. Defense counsel argued that, based on the evidence, the jury might determine that the shooting was the result of a "sudden quarrel or argument or confrontation," thus negating the element of malice. The trial court rejected this argument stating, "[T]here was absolutely no evidence of any quarrel, any exchange of words really other than pleasantries. There was nothing. The jury would have to make the wildest speculation." The trial court rejected the proffered instruction under either the theory that the shooting was the result of a sudden quarrel or the theory that appellant shot Harper due to an unreasonable belief that deadly force was necessary in defense of himself.

Appellant claims reversible error based on the trial court's refusal to give an attempted voluntary manslaughter instruction. We find no error in this regard.

■ " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], *but not when there is no evidence that the offense was less than that charged.* [Citations.]" (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], italics added, disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)

Attempted murder is the attempt to commit an unlawful killing of a human being, or a fetus, with malice aforethought. (§§ 664, 187.) ■ A killing committed upon a sudden quarrel or heat of passion or under an honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury may negate malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to attempted manslaughter. (See *People* v. *Flannel, supra,* 25 Cal.3d at pp. 674-680.) For a finding of attempted voluntary manslaughter under the heat of passion theory, both provocation and heat of passion must be demonstrated. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 719.)

■ In the instant case, there is nothing in the record "substantial enough to merit consideration" by the jury of the lesser included offense of attempted voluntary manslaughter under a theory of sudden quarrel or heat of passion or unreasonable self-defense. (*People* v. *Flannel, supra,* 25 Cal.3d at p. 684, fn. 12.) As pointed out by the trial court, there is no evidence of a quarrel, sudden or otherwise, between appellant and Officer Harper prior to the shooting and certainly there is no evidence of any provocation. According to the uncontroverted evidence presented at trial, Officer Harper approached appellant and asked him if he had purchased the newspaper in his hand. Upon seeing the screwdriver in appellant's pocket, Harper then directed appellant to put the newspaper on the hood of the patrol car and to put his hands on top of his head. It was not until appellant disobeyed these orders and began, instead, to back away from the officer with his hand in his pocket that the two became embroiled in a physical struggle. Harper grabbed appellant's arm and a struggle ensued when appellant physically resisted the officer. Within a matter of seconds after the struggle began, appellant shot Harper twice and returned to the scene with the apparent intention of shooting him again. Nothing in these facts is supportive of a

finding that the shooting was the result of a sudden quarrel or heat of passion.

Nor are the facts supportive of a finding that the shooting resulted from an honest but unreasonable belief on appellant's part that it was necessary for him to defend himself from imminent peril to life or great bodily injury. Up until appellant resisted the officer and the struggle between the two ensued, there was nothing to indicate any peril whatsoever to appellant. What peril there was was directed at Officer Harper, not appellant.

### III

Over defense counsel's objection, the trial court granted the People's motion to excuse two jurors for cause. Appellant maintains this was reversible error. We disagree.

One of the jurors at issue was a woman who was presently being prosecuted by the Alameda County District Attorney on a charge of driving under the influence of an alcoholic beverage. The possibility existed, in fact, that the complaint against her may have been filed by the same deputy district attorney who was prosecuting the instant case. The juror indicated that she felt no animosity toward the police or the prosecution as a result of the case against her and that she, in fact, thought she would plead guilty to the charges against her. Nevertheless, the trial court dismissed her for cause stating, "I think what bothers me so very much is we don't know what's around the corner. You know, we think we know how the case is going to go down and I don't have any doubt about this woman, . . . her reliability in saying that she separates the two incidents . . . . [¶] . . . But some funny things happen on the way to trial and sometimes something could go wrong . . . .

". . . . . . . . . . . . . . . . . . .

"I do not believe it's appropriate to have the same . . . office prosecuting a juror as [is] prosecuting the defendant."

The second juror who was dismissed for cause over defense counsel's objection, was a man who had had at least four "meetings or encounters" with Officer Harper 10 to 15 years earlier, one of which involved an actual argument between him and the policeman. The argument was based on an alleged refusal by police to arrest a drug dealer allegedly because the dealer was also a police informant. When asked if he harbored any ill feelings against the police or Officer Harper because of these incidents he responded, "Not as regard[s] all police officers, no . . . ; but as regards the San

Leandro police, it does . . . , bearing in mind that this happened ten years ago before the incident that's on trial here." The juror denied that his experience would affect the way he listened to or decided the instant case. However, he later admitted, "[T]here is a side to police work that I've seen that probably a lot of these jurors haven't seen. I haven't seen it for a long time. I'm not involved in it, and to me it puts a whole new meaning on the term, police work, and I don't know that I, I'd be able to divorce myself from that view of police work that I saw back then . . . ." Finding the juror "quite . . . emotionally laden," the trial court dismissed him stating, "I think it's entirely possible that when he sees Harper, Harper may be the man that in effect made him feel better about some things and that he's more ready to accept his testimony because of the past experiences, or it may turn out that Harper is the man that made him angry and, therefore, he wouldn't take the time of day from him. I don't know which way, but . . . if we have to call another panel, it's worth it to make sure that we don't at least knowingly . . . accept someone that's had prior experience with a very important witness in this case."

Section 1073, subdivision (b), provides that a prospective juror may be excused for actual bias when his state of mind is such that it "will prevent him or her from acting with entire impartiality and without prejudice to the substantial rights of either party . . . ." ■ Our Court of Appeal has stated that " '[t]he question of whether a prospective juror has a prejudiced state of mind amounting to actual bias is ordinarily an issue of fact left to the sound discretion of the trial judge.' [Citations.] 'It is also the rule that "Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. . . ." ' [Citations.]" (*People* v. *Clay* (1984) 153 Cal.App.3d 433, 450 [200 Cal.Rptr. 269].)

■ We find no abuse of discretion in the trial court's rulings here. Certainly, in the case of the first juror who was facing prosecution for drunk driving, the trial court was correct in being concerned about a possible turn of events in that case which could have an effect on the juror's state of mind in the instant case particularly where, as here, there exists the possibility that the two cases were filed by the same deputy district attorney. As to the second juror in question, it is clear from the above that the juror made conflicting statements about his ability to remain impartial in the case at bar. Accordingly, under the rule enunciated above, the trial court's determination as to his state of mind is binding on this court.

"The trial court, not being limited to a mere examination of a faceless record, [is] instead uniquely positioned to evaluate the sincerity and credibility of the prospective veniremen . . . . Absent any clear factual basis for

doubting the correctness of the court's ruling, we regard ourselves as being bound by it." (*People* v. *Clay, supra,* 153 Cal.App.3d at p. 453.) The tenor of the examination of a prospective juror is not always discernible from the appellate record and the demeanor of a prospective juror is often as important as the spoken word. The trial judge is generally in a preferable position to evaluate the presence of bias or lack of impartiality.

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.