Filed 3/15/16  P. v. Rodriguez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C075491 |
| Plaintiff and Respondent, | (Super. Ct. No. TF036249A) |
| v. | |
| JOSE APOLINAR RODRIGUEZ, | |
| Defendant and Appellant. | |

While Ro.M and her teen-aged daughter M. slept, defendant Jose Apolinar Rodriguez--Ro.M.'s ex-husband and M.'s father--crept into their locked bedroom using a secretly made key and brutally attacked them with a machete and a knife.  Defendant was convicted of premeditated attempted murder (Pen. Code, §§ 664/187, subd. (a); unless otherwise stated, section references that follow are to the Penal Code), inflicting corporal injury on a spouse/cohabitant (§ 273.5, subd. (a)), criminal threats (§ 422), child abuse/endangerment (§ 273a, subd. (a)), and assault with a deadly weapon (§ 245, subd. (a)(1)).  The jury found special allegations that defendant personally used a weapon and inflicted great bodily injury during the attack to be true.  (§§ 12022, subd. (b)(1),

1

12022.7, subd. (e).) Defendant was sentenced to life with the possibility of parole consecutive to 17 years eight months in prison.

Defendant contends the trial court prejudicially erred in refusing to instruct the jury on the lesser included offense of attempted voluntary manslaughter based on heat of passion. He also claims the court erred in failing to stay the sentence on his criminal threats conviction under section 654, and that the abstract of judgment's reference to section "664" rather than section "654" is a clerical error that must be corrected on appeal. We agree the abstract of judgment should be corrected, but otherwise affirm the judgment.

FACTS AND PROCEEDINGS

*The Relationship between Defendant and Ro.M.*

Defendant and Ro.M. were married in 1981, and had three daughters, Rosa, Alejandra, and M. Due to defendant's drinking and domestic violence issues, they divorced in 2004 and defendant eventually moved to Los Angeles while Ro.M. and the girls stayed in San Joaquin County. Defendant occasionally saw his daughters over the next several years. Ro.M. and defendant had no romantic involvement during this time.

In the summer of 2010, Ro.M. and the girls agreed that defendant could move into their garage. But they set strict rules for defendant about living at the house. Defendant was not permitted to interfere with Ro.M.'s personal life, and he was not permitted to go into Ro.M.'s bedroom.

Within a week of moving into the garage, Ro.M. told defendant that she was dating someone. Defendant proposed getting remarried, but Ro.M. told him no. Defendant and Ro.M. would speak from time to time, but no romantic relationship existed between the two.

On several occasions, Ro.M. found defendant hiding in the closet in her bedroom. To keep defendant out, Ro.M. put a lock on the bedroom door. The lock had two keys;

2

Ro.M. had one key and Rosa had the other. Unbeknownst to Ro.M. or the girls, defendant secretly stole Ro.M.'s key and made a copy.

*The Incident*

On December 3, 2010, Ro.M. left the house on a date. She did not come home that night. Defendant was at the house the next morning when Ro.M. returned and saw that she was still dressed as she had been the night before. Ro.M. and defendant did not speak.

Later that night, Ro.M. left for church. While there, she received a text message from her daughter Rosa saying to be careful because defendant was very upset. Defendant had asked Rosa if her mother was seeing someone. Rosa responded that it was none of his concern if Ro.M. was dating someone, and that he should just be worried about her and her sisters, not their mother. Rosa then left the house.

Ro.M. returned home around 9:00 p.m., and went to bed. Defendant did not confront Ro.M., or even speak with her.

Although defendant ordinarily slept in the garage, he told his daughter M. that he intended to sleep on the living room couch that night. Worried her father was acting strangely, M. called her sister Rosa. Rosa told M. to sleep in their mother's bedroom that night because if M. was there, Rosa believed defendant would not do anything. M. then went to Ro.M.'s room. M. locked the bedroom door, crawled into bed with Ro.M., who was already sleeping, and went to sleep.

Around 1:00 or 2:00 a.m., Ro.M. and M. were suddenly awakened when the bedroom door slammed open. Defendant turned on the lights, and stood in the doorway holding a machete. He had used his secret key to unlock the door.

Defendant said he, "couldn't take it," and told Ro.M. that, "Today you will die, because no one is going to make fun out of me." Defendant slowly advanced toward the bed, raised the machete, and struck Ro.M. in the head. M. tried to intervene to protect

3

her mother. Defendant tried to strike another blow, but Ro.M. put her hand up to block it. Ro.M.'s right thumb was nearly severed.

Defendant, Ro.M., and M. struggled for control of the machete and eventually fell to the floor. The machete ended up between M.'s legs. Ro.M. pleaded with defendant not to pull on the machete otherwise M. would be cut. Defendant then pulled out a four-inch knife from his pocket. He began stabbing Ro.M. in the legs and abdomen. M. was also stabbed during the struggle.

Defendant eventually stopped trying to stab Ro.M., and told M. that Ro.M. was "already dead." He said to wait to call the police so he could kill himself. After defendant got up and left the bedroom, M. closed the door and shoved a sofa in front of the door so defendant could not reenter. M. hysterically called Rosa and told her their father had stabbed their mother. M. then called the police.

Officers quickly arrived and forced their way into the house. They found Ro.M. nearly unconscious and badly wounded. The bedroom, Ro.M., and M. were covered in blood. Ro.M. and M. were transported to separate hospitals for treatment. Nearly 15 staples were required to close the wound on Ro.M.'s head and she required surgery to fix multiple wounds to her hands.

Officers discovered defendant unconscious face down in the garage. A bloody knife was underneath his legs, and his clothes were bloody. A noose made from an electrical cord hung from the rafters. A signed suicide note, written by defendant, lay on a nearby table. Neither the note nor the table had blood on them. Defendant wrote, "I killed her for being a bitch or a whore like her mother Ofelia." Ro.M.'s mother's name was Ofelia. Among other things, the note also said, "not going to make fun of me or laugh at me," "I couldn't do this anymore," and "I know why I did it."

Defendant was arrested and interviewed at the police station. During the interview, defendant was calm and showed little emotion. Defendant recounted his personal history with Ro.M. and told the officer that they divorced because he drank.

4

They never got back together or resumed their relationship following the divorce. Defendant, however, said he wanted to rekindle their relationship.

Defendant admitted he became jealous upon seeing Ro.M. walk into the house after staying out all night with her date. Defendant and Ro.M. did not speak, and Ro.M. went into her bedroom. Later that afternoon, defendant told his daughter Rosa that he felt Ro.M. was "doing wrong." Although defendant described himself as "extremely upset," he did not confront Ro.M.

Defendant knew Ro.M. left the house again around 4:00 p.m. and returned home around 9:00 p.m. He said he planned to kill Ro.M. with a machete in the middle of the night, and then commit suicide by hanging himself in the garage. When asked to describe his plan specifically, defendant said, "my plan was to basically slit her throat if she was laying [sic] down. And if she wasn't, then I would cut her up and hang myself."

Defendant waited on the living room couch with the machete until he thought everyone was asleep. Defendant heard M. get up, however, so he closed his eyes and pretended to be asleep until she went back to bed. Once defendant thought she was back in her room, he walked with the machete towards Ro.M.'s bedroom. He used the key he made to open the locked door. He flicked on the light and realized that M. was actually in bed with her mother. Nevertheless, defendant told Ro.M. he was going to kill her. He then attacked Ro.M. with the machete. During the struggle, when they were fighting over the machete, he remembered he had a knife in his pocket so he pulled out the knife and began stabbing Ro.M. Although he never intended to hurt M., she was stabbed in the melee.

Defendant finally stopped stabbing Ro.M. and asked that they wait a few minutes before calling the police. He then went to the garage and tried, unsuccessfully, to hang himself. He came to when the police were handcuffing him.

5

*Trial Proceedings*

A June 2011information charged defendant with premediated attempted murder (§§ 664/187, subd. (a), count 1), mayhem (§ 203, count 2), infliction of corporal injury to a spouse or cohabitant (§ 273.5, subd. (a), count 3), criminal threats (§ 422, count 4), child abuse/endangerment (§ 273A, subd. (a), count 5), and assault with a deadly weapon (§ 245, subd. (a)(1), count 6). Each count further alleged that defendant personally used a deadly weapon or weapons. (§ 12022, subd. (b)(1).) Counts 1, 3, 5, and 6 also alleged defendant inflicted great bodily injury during the offenses. (§ 12022.7, subd. (e).)

At trial, defendant conceded he had attacked Ro.M. with the machete and the knife. According to the defense, the only real issue was whether he did it with premeditation and deliberation as the People alleged, or whether the attack was an impulsive rash act by a jealous man as defendant claimed.

During the jury instruction conference, defendant requested that the trial court instruct the jury on attempted voluntary manslaughter based on heat of passion as a lesser included offense to attempted murder. After hearing arguments from counsel, the court found there was insufficient evidence of provocation to support such a theory and declined to give the requested instruction.

Before the case went to the jury, the People dismissed the count 2 mayhem charge. The jury convicted defendant of all remaining charges and found the attached enhancement allegations true.

Defendant was sentenced to prison for life with the possibility of parole plus a consecutive 17 years eight months calculated as follows: life with the possibility of parole for premeditated attempted murder (§§ 667/187, subd. (a); count 1), plus one year for each of the two weapon enhancements (§ 12022, subd. (b)(1)) and five years for the great bodily injury enhancement (§ 12022.7, subd. (c)); a consecutive eight months (one-third the midterm of two years) for criminal threats (§ 422; count 4), plus 1 year stayed

6

for the attached personal use of a weapon enhancement (§ 12022, subd. (b)(1)); and a consecutive six years for child abuse/endangerment (§ 273A, subd. (a); count 5), plus one year for the personal use of a weapon enhancement (§ 12022, subd. (b)(1)) and three years for the great bodily injury enhancement (§ 12022.7, subd. (c)). Under section 654, the court imposed and stayed the upper terms of four years for infliction of corporal injury to a spouse or cohabitant (§ 273.5, subd. (a); count 3) and assault with a deadly weapon (§ 245, subd. (a)(1); count 6) as well as the remaining enhancements. Defendant timely appealed.

DISCUSSION

I

*Duty to Instruct on Lesser Included Offense*

Defendant contends the court had a sua sponte duty to instruct on attempted voluntary manslaughter in the heat of passion, a lesser included offense to attempted murder. The absence of such an instruction, he contends, deprived him of due process of law. But there was no substantial evidence that would support attempted voluntary manslaughter in the heat of passion and the trial court, therefore, did not have a sua sponte duty to so instruct the jury regarding that offense.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

This instructional requirement includes the duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the

7

greater. (*Breverman, supra,* 19 Cal.4th at p. 157.) The duty exists even when the lesser included offense is inconsistent with the defendant's own theory of the case and the defendant objects to the instruction. (*Id.* at pp. 154, 157.) This rule "seeks the most accurate possible judgment by 'ensur[ing] that the jury will consider the *full range of possible verdicts*' included in the charge, regardless of the parties' wishes or tactics." (*Id.* at p. 155.) "Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Ibid.*)

In deciding whether there is substantial evidence to support a lesser included offense instruction, a court determines only the bare legal sufficiency of the evidence, not its weight. (*Breverman, supra,* 19 Cal.4th at p. 177.) In doing so, courts "should not evaluate the credibility of witnesses," which is a task for the jury. (*Id.* at p. 162.) We review the trial court's failure to instruct on a lesser included offense de novo, considering the evidence in the light most favorable to the defendant. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

"Attempted murder is the attempt to commit an unlawful killing of a human being, or a fetus, with malice aforethought." (*People v. Williams* (1988) 199 Cal.App.3d 469, 475 (*Williams*).) "A killing committed upon a sudden quarrel or heat of passion or under an honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury may negate malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to attempted manslaughter." (*Ibid.*)

To establish attempted voluntary manslaughter under a heat of passion theory, both provocation and heat of passion must exist. (*Williams, supra,* 199 Cal.App.3d at p. 475; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709 (*Gutierrez*).) "First, the provocation which incites the killer to act in the heat of passion case must be caused by the victim or reasonably believed by the accused to have been engaged in by the

8

decedent.  [Citations.]  Second,  . . . the provocation must be such as to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411-1412.)

" '[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless . . . the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Berry* (1976) 18 Cal.3d509, 515 (*Berry*).)  " '[T]he fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion--not necessarily fear and never, of course, the passion for revenge--to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Ibid.*)

The *Berry* decision, where the Supreme Court found the trial court erred in refusing to instruct on voluntary manslaughter based on heat of passion, provides useful guidance on the type of conduct necessary to support such an instruction.  (*Berry, supra,* 18 Cal.3d at p. 512.)  In *Berry*, the evidence showed "a two-week period of provocatory conduct by [the defendant's] wife . . . [which] could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Berry, supra,* 18 Cal.3d at p. 515.)  Three days after marrying, defendant's wife returned to her native Israel and began a sexual affair with another man.  (*Id.* at pp. 513-514.)  When she returned home, she repeatedly taunted defendant with details of the affair, claimed she might be carrying the other man's child, asked for a divorce, fought violently with defendant, and then engaged in sexual intercourse with defendant.  (*Ibid.*)

There was also expert medical testimony that defendant's wife was depressed and suicidally inclined, and that she sexually aroused defendant and taunted him into jealous rages in an unconscious desire to provoke him into killing her, thus consummating her

9

desire for suicide. (*Berry, supra,* 18 Cal.3d at p. 514.) During one such violent confrontation, defendant choked his wife to death with a telephone cord. (*Id.* at p. 514.) Significantly, both the defendant and a medical expert testified that defendant was in the heat of passion under an uncontrollable rage when he killed his wife. (*Id.* at pp. 515-516.)

While defendant concedes the present facts are hardly those presented in *Berry*, he nevertheless maintains that the evidence at trial warranted an instruction on attempted voluntary manslaughter based on heat of passion. According to defendant, by inviting him to live in the garage knowing that he still had feelings for her, Ro.M. essentially led him to believe there was a chance they could rekindle their romantic relationship. When defendant saw Ro.M. come home after her overnight date he became enraged and tried to kill her during a heat of passion without due deliberation and reflection.

We find the evidence of provocation and heat of passion decidedly absent, however. The uncontroverted evidence showed defendant and Ro.M. had been divorced for nearly seven years. During that time, they had never once resumed or rekindled their romance. In fact, they never returned to any sort of marital or sexual relationship. When defendant proposed remarriage, Ro.M. declined. She also told defendant that she was dating someone within a week of defendant moving into the garage.

Defendant, moreover, was told he could stay in the garage only if he followed certain rules, including that he stay out of Ro.M.'s personal life. He was not allowed in her bedroom. Ro.M. even put a special lock on her door to keep defendant out.

Defendant admitted there was no confrontation between him and Ro.M. when she returned home from her overnight date, nor did the two speak when Ro.M. returned from church the night of the attack. Ro.M. went to sleep and was awoken by defendant in the middle of the night after he burst into her locked bedroom.

Defendant admitted to police that he planned to kill Ro.M. by slitting her throat or chopping her up with the machete. He also admitted he retrieved the machete from the

10

garage, pretended to be asleep on the couch when he heard M. get up, and then used the key he secretly made to enter Ro.M.'s room. Defendant was calm and showed little emotion when he described his plan to police.

Defendant's suicide note is further evidence that defendant did not act rashly under a heat of passion in trying to kill Ro.M. The evidence showed the note did not have any blood on it. Ro.M. and M., however, were both covered in a substantial amount of blood when police arrived. Defendant himself had blood on his clothes when police found him unconscious in the garage. A reasonable inference, then, is that defendant wrote the suicide note before he attacked Ro.M. and had time to plan and reflect on his actions.

According to the note, defendant attempted to kill Ro.M. because she was a "whore." Defendant's suicide note thus evinces an intention to exact revenge on Ro.M. It is well settled that the passion for revenge never justifies giving a voluntary manslaughter instruction. (*Berry, supra,* 18 Cal.3d at p. 515.)

Here, there is no evidence in the record remotely suggesting any objectively reasonable provocation or that the defendant acted during a heat of passion. The trial court, therefore, was amply justified in refusing to instruct the jury on voluntary manslaughter based on heat of passion.

The evidence presented is more similar, we believe, to *People v. Bufarale* (1961) 193 Cal.App.2d 551, 557 (*Bufarale*), where the trial court properly refused instructions on voluntary manslaughter. There, the defendant had an affair for several months with his victim, but she eventually decided to return to her husband. (*Bufarale, supra,* 193 Cal.App.2d at pp. 554-556.) A few days later, the defendant and the decedent spoke although they did not engage in a quarrel or confrontation. (*Id.* at p. 562.) Later that day, the defendant ran the decedent's car off the road, opened her door, and repeatedly stabbed her in front of her young children. (*Id.* at pp. 562-563.) The defendant claimed he killed her not because of a thinking process, but because of his emotions, over which he had no

11

control.  He stabbed her during the heat of passion resulting from an emotional imbalance that arose from his love for and rejection by the victim.  (*Id.* at p. 560.)  The court, however, found the killing was simply an act of vengeance that did not occur during a heat of passion.  (*Bufarale, supra,* 193 Cal.App.2d at p. 562.)

As in *Bufarale*, even if defendant was emotional about his resumption of a relationship with Ro.M. after they had been divorced for approximately seven years and jealous that she had stayed out all night with her date, the undisputed evidence shows there was no confrontation between the two.  There was no provocation.  (See e.g., *People v. Hyde* (1985) 166 Cal.App.3d 463, 473 [victim's mere dating of another individual, which made defendant jealous, did not constitute sufficient provocation for purpose of voluntary manslaughter instruction].)

We also reject defendant's argument that the trial court improperly evaluated the credibility of the witnesses in deciding whether sufficient evidence of heat of passion and provocation warranted giving a voluntary manslaughter instruction.  Trial courts routinely evaluate the substantiality of the evidence like the trial court did here.  (See e.g., *People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*) [trial court correctly concluded based on defendant's own there was no substantial evidence to show defendant acted while under the actual influence of a strong passion in response to legally sufficient provocation]; *People v. Wickersham* (1982) 32 Cal.3d 307, 323, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200 [trial courts function as a neutral arbiter between two contesting parties and the jury's guide to the law].)

Implicitly, defendant contends that a trial court, no matter how weak the evidence, is duty-bound to instruct on a lesser included offense since refusing to give such an instruction equates, in defendant's view, with evaluating the credibility of the witnesses.  That is not the case.  It is well settled that " 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense . . . .' "  (*Moye, supra,* 47 Cal.4th at p. 553.)

12

Even if Ro.M.'s testimony is disregarded and only defendant's admissions and description of the events is considered, no reasonable juror could conclude defendant acted rashly or without due deliberation and reflection in response to a heat of passion. Defendant never told police he and Ro.M. were back together after being divorced for nearly seven years. While he was jealous in his mind, he admitted that he never confronted Ro.M. nor did he ever speak to her the night of the planned attack. He said he planned to kill Ro.M. with the machete and then hang himself. He left a suicide note that said he killed Ro.M. because she was a whore. When M. came out of her room around midnight, defendant admitted he concealed the machete and pretended to be asleep until she went back to bed. He then got up from the couch, walked down the hall to Ro.M.'s locked bedroom, and used his secretly made key to open the door to attack Ro.M.

Defendant's claim that Ro.M. somehow "toy[ed]" with his emotions, leading him to believe there was a chance at reconciling is barely beyond fantasy. That she did not tell him to vacate the garage after she rejected his marriage proposal does not constitute sufficient provocation as defendant implies.

In short, the evidence shows that Ro.M. did nothing to provoke defendant within the meaning of the law. Perhaps more importantly, on this record, it cannot be said, reasonably, that the situation that defendant faced was one that would have caused an ordinary person of average disposition to act as he did.

There was no basis to instruct the jury on the lesser included offense of attempted voluntary manslaughter based on a theory of heat of passion because there was insufficient evidence of the requisite provocation and heat of passion even when viewing defendant's own admissions in the light most favorable to him. The trial court, therefore, did not err in refusing to so instruct the jury.

## II

### *Section 654*

Defendant contends that he threatened Ro.M. and attempted to kill her during a single course of conduct for which he may only be punished once under section 654. The trial court, however, imposed separate sentences for both the count 1 attempted murder conviction and the count 4 criminal threats conviction. Finding the trial court properly sentenced defendant on both convictions, we reject defendant's section 654 challenge.

Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute does not prohibit multiple convictions for the same conduct, only multiple punishments. (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.) "In such a case, the proper procedure is to stay execution of sentence on one of the offenses." (*Ibid.*)

In any section 654 inquiry, the court must initially ascertain the defendant's objective and intent. (*People v. Porter* (1987) 194 Cal.App.3d 34, 38 (*Porter*).) " 'If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*Ibid.*) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*Ibid.*)

The record in this case supports the trial court's implicit finding that threatening Ro.M. and attempting to kill her involved multiple objectives even though they may have shared common acts or were otherwise parts of an indivisible course of conduct. Here,

14

defendant could have quietly entered the room with his secret key without turning on the bedroom light, and attacked Ro.M. while she was sleeping. In other words, there was no need to threaten her. But defendant did not do that.

Instead, defendant slammed the bedroom door open, flicked on the light, and told Ro.M. she was going to die. This obviously frightened Ro.M. He then slowly walked across the room and struck her over the head with the machete and later stabbed her with the knife.

A reasonable inference from the evidence is that defendant had two distinct objectives. In making the threats to kill her when he first entered the bedroom, defendant intended to frighten Ro.M. whereas in hitting her on the head with the machete and stabbing her with the knife, he intended to kill. Because defendant committed multiple and divisible acts with distinct objectives, section 654 was not violated by sentencing him on both the criminal threats and attempted murder convictions. (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1022 [defendant properly sentenced under section 654 on both arson and criminal threats convictions].)

III

*Abstract of Judgment*

Defendant contends, and the People agree, that the abstract of judgment contains a clerical error. The abstract of judgment erroneously states that the sentences on count 3, an enhancement on count 4, and count 6 were stayed pursuant to section 664, which governs attempted offenses, rather than section 654 concerning staying multiple punishments. (§§ 654, 664.)

Appellate courts have the inherent power to correct clerical errors in a judgment at any time. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) "Rendition of the judgment is normally an oral pronouncement, and the abstract of judgment cannot add to, or modify, the judgment, but only purports to digest and summarize it." (*People v. Zackery* (2007)

15

147 Cal.App.4th 380, 389 (*Zackery*).) "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*Id.* at p. 385.)

We agree the abstract of judgment in this case contains such a clerical error. We therefore order that the abstract be corrected to reflect that the court orally stayed the various sentences pursuant to section 654.

DISPOSITION

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment, reflecting that the sentence on count 3, the enhancement on count 4, and the sentence on count 6 were stayed pursuant to section 654. The court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


                                                          HULL              , J.



We concur:


      BLEASE            , Acting P. J.



      NICHOLSON        , J.


16