Filed 11/19/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B330041 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA103925) |
| v. | |
| ELISEO MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jared D. Moses, Judge. Affirmed.

Jeffrey Manning-Cartwright, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan M. Krauss and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellant Eliseo Martinez restrained Nicasio Calixto Pascual[1] while his cousin Valente Martinez[2] stabbed him 18 times.  During an interview with the investigating detective and his partner, Martinez admitted his participation in the stabbing. Now, he claims the trial court improperly denied an instruction on voluntary manslaughter based on heat of passion, even though it was not supported by the evidence and was prohibited under Penal Code section 192, subdivision (f)(1)[3] based on circumstances related to the victim's sexual orientation. Martinez also argues that the trial court violated his constitutional and statutory rights to be present at trial by finding him voluntarily absent.  We reject both arguments and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Facts

#### A.  The Prosecution Evidence

##### 1.  The incident

Calixto was an openly gay man who lived in San Gabriel, California.  He had seen Martinez on multiple occasions in the neighborhood.  Martinez lived near Calixto in an apartment he

---

[1]     We refer to the victim as Calixto to be consistent with the parties.

[2]     Martinez and his companion Valente Martinez have the same last name.  To avoid confusion, we refer to Valente Martinez by his first name.

[3]     All further undesignated statutory references are to the Penal Code.

shared with their mutual friend named Nora. Calixto did not know Martinez's name, but their interactions were friendly.

On October 5, 2017, at about 10:00 p.m., Calixto parked his minivan at a parking lot near his apartment. As he walked toward his apartment, Martinez called out to him. Valente was standing near Martinez. Calixto had never seen Valente before. Martinez invited Calixto to dinner. Calixto declined because he had already eaten. Martinez asked Calixto to give them a ride. Calixto agreed to take them to a taco shop. When they arrived, Martinez said they did not have any money. Calixto asked Martinez why he invited him to dinner without money. Martinez did not respond. Calixto gave $20 to him. He waited in the minivan while Martinez and Valente went inside to eat.

When Martinez and Valente returned, Calixto drove them back to the parking lot where he first encountered them. Valente had beer and suggested they drink it in the minivan. Valente took out two 40-ounce bottles of beer from his backpack. Valente was drinking a 40-ounce beer, while sitting behind Calixto, who was in the driver's seat. Martinez sat in the front passenger seat and drank the other bottle. Valente gave a can of beer to Calixto.

While they were drinking, Martinez said to Calixto, "I want to introduce you to my friend. Here, here's my friend." Calixto felt uncomfortable. Calixto believed Martinez was mocking him or making fun of him. Calixto responded, "Hey, dude. What do you think, I don't know him. I don't know him." Martinez persisted, saying, "Come on. Grab him. Grab him. I brought him for you." Calixto continued to express he was uncomfortable, stating, "No, no. What do you think, dude. . . . What do you think? I don't know him. I don't know him." Calixto turned his attention to his cellphone. At one point, Martinez grabbed

Calixto's hand and placed it on Valente's leg.  He pulled his hand away.  Calixto refused to touch a man he did not know in such a manner because it showed lack of respect.

Martinez and Valente continued drinking beer, while Calixto continued to send text messages to his friends.  Valente then hit Calixto in the center of his forehead with a beer bottle, shattering it into pieces.  Before Calixto was hit with the bottle, he never tried to grab Valente or Martinez, sit on them, or touch them inappropriately.  He never tried to be romantic with Martinez or Valente.

After Valente struck Calixto with the bottle, he told Martinez to grab him.  Without hesitation, Martinez immediately followed Valente's instruction to grab Calixto.  Martinez pulled Calixto toward him and held his hands together.  Martinez extended Calixto's upper body over the center console.  Calixto's legs remained on the driver's seat.  Valente began stabbing Calixto.

Calixto pleaded, "Come on, guy, please release me.  Release me."  He felt the knife each time Valente stabbed him.  He thought about his family and believed Valente was going kill to him.  Several times while being stabbed, Calixto screamed, "Please let me go. I can't stand it anymore.  Please let me go."  Martinez never released Calixto nor loosened his grip on him as he tried to pull away.  At no time did Martinez tell Valente to stop stabbing Calixto or otherwise try to stop Valente from stabbing him.  Calixto kicked the driver's window until it shattered.  He screamed for help and Martinez and Valente fled from the minivan.  Before fleeing, Martinez never checked on Calixto.

4

Calixto threw himself out of the minivan and fell on the ground. He tried to run but he was very tired and bleeding a lot. He screamed, "Help, please. Help."

2. Injuries and medical treatment

A man named Jose Flores, Jr. heard Calixto screaming for help and saw him in the parking lot, covered in blood. Flores approached Calixto, who said, "Help me. I don't want to die." Flores called for an ambulance.

An ambulance arrived and transported Calixto to Los Angeles County USC Hospital. He was taken directly to the operating room due to his critical condition and underwent surgery. Dr. Vincent Chong was the trauma surgeon who operated on Calixto for two to three hours.

Calixto sustained 18 stab wounds. Several stab wounds penetrated his torso. His abdomen had a moderate amount of blood in it. Ten to 15 wounds penetrated several inches through the skin and down to the organs, including the diaphragm, left chest, spleen, stomach, liver, and colon. The diaphragm had several small cuts in it. There was blood in his left chest. Calixto lost a lot of blood and required several blood transfusions. The spleen was removed to prevent further blood loss. The injuries to the organs were life-threatening. Dr. Chong opined that without prompt medical intervention, Calixto would have died.

3. Investigation

Los Angeles County Sheriff's Detective Robert Leyba was assigned to investigate the incident involving Calixto. Due to Calixto's condition, Detective Leyba was unable to speak with him for five days. When Detective Leyba was finally able to speak with Calixto, he identified Martinez as one of his attackers. Detective Leyba also asked him why he thought Martinez and

5

Valente attacked him. Calixto responded, "I don't know, it's because I grabbed the guy's leg and then he got angry? I don't know what got into him. I don't know."

Martinez was apprehended almost one year after the incident. Detective Leyba and Deputy Rivera interviewed Martinez. Martinez admitted that he was involved in a fight, and vacated an apartment he shared with a woman named Nora. Martinez stated that Valente was dating Nora. Valente was his cousin.

Martinez told Detective Leyba and Deputy Rivera that the fight took place in a van parked in a shopping center near his apartment. Martinez and Valente ran into a man whose name he did not know. They went to get tacos and remained with the man in the parked van. Martinez said that he and Valente entered the van because the man offered them beer.

Martinez said that before entering the van, he knew the man was gay because someone had told him. According to Martinez, Valente did not know the man was gay before entering the van. Martinez initially said, "I didn't fight." He said the man was coming onto him. He also said the man was harassing Valente and him. According to Martinez, the man "hugged" them and "climb[ed] on top" of them. The man also told Valente that he liked him. Martinez said Valente "didn't like it." Valente hit the man in the head with a bottle and "knifed" him about four times.

Martinez admitted that he did not try to stop Valente from stabbing the man. He also admitted that he held the man while Valente stabbed him. When Deputy Rivera asked why he held the man, Martinez replied, "I don't know, it's an instinct maybe." Deputy Rivera clarified by asking if Martinez helped Valente

6

because he was his cousin.  Martinez answered, "I think so."  Martinez said he "didn't think" he held the man because he was "homosexual."  He said he did it to help Valente.

Martinez told Detective Leyba and Deputy Rivera that the man broke a window and jumped out of the van.  He had not seen nor heard about the man since the incident.  Martinez and Valente walked through nearby tunnels and then separated from one another.  Martinez never returned to his apartment.  He had blood on his clothes and threw them away.  He did not know what Valente did with the knife.

### B. Defense Evidence

Martinez relied on the state of the evidence.

## II. Procedure

### A. The Verdict

On May 11, 2022, the jury found Martinez guilty of attempted murder (§§ 664, 187, subd. (a)).  The court found true the allegation of a prior strike conviction for assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)) with the personal infliction of great bodily injury enhancement (§ 12022.7, subd. (a)).  The court also found true the aggravating circumstances that the crime involved great violence (Cal. Rules of Court, rule 4.421(a)(1)), the victim was particularly vulnerable (*id.*, rule 4.421(a)(3)), the crime constituted a hate crime (*id.,* rule 4.421(a)(12)), Martinez engaged in violent conduct that indicated a serious danger to society (*id.,* rule 4.421(b)(1)), he was on probation when the offense was committed (*id.,* rule 4.421(b)(4)), and his prior performance on probation was unsatisfactory (*id.*, rule 4.421(b)(5)).

7

*B.  Sentencing*

On April 24, 2023, the court sentenced Martinez to nine years for the attempted murder, selecting the upper term of nine years as the base term.  The court doubled this term pursuant to the Three Strikes law.[4]  The court imposed an additional and consecutive five years for the prior serious felony conviction enhancement under section 667, subdivision (a).  The aggregate term of imprisonment was 23 years in state prison.

## DISCUSSION

## I.  Attempted Voluntary Manslaughter Instruction

Martinez argues that the trial court should have instructed the jury on attempted voluntary manslaughter based on heat of passion as a lesser included offense to attempted murder.  We reject this argument because Martinez did not act in subjective emotion caused by objectively sufficient provocation.

An instruction on a lesser included offense is required when the evidence that the defendant is guilty only of the lesser offense is " 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 261, fn. 7, quoting *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12, superseded by statute on another ground as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777.)  Substantial evidence consists of evidence from which a reasonable jury could conclude the lesser offense, but not the greater, was committed.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)  A reviewing court should not evaluate the credibility of witnesses.  (*Breverman*, at p. 162.) "[T]he existence of '*any* evidence, no matter how weak' will not

---

[4]  Sections 667, subdivisions (b) through (i), 1170.12, subdivisions (a) through (d).

8

justify instructions on a lesser included offense." (*Ibid.*, quoting *Flannel*, at p. 684, fn. 12, original italics.)

Attempted murder is reduced to attempted voluntary manslaughter when a person tries to kill in the heat of passion or upon a sudden quarrel. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708–709; *People v. Williams* (1988) 199 Cal.App.3d 469, 475.) The direct perpetrator of an attempted voluntary manslaughter must intend to kill. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549–1550.) But even when a person intends to kill another and tries to kill him, heat of passion can mitigate the attempted murder to attempted voluntary manslaughter by precluding the formation of malice. (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1136–1137.)

Similarly, an aider and abettor of attempted voluntary manslaughter must also intend to kill. "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).) With attempted voluntary manslaughter, as well as attempted murder, "the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, at p. 1118.)

But an aider and abettor's guilt is based on his independent mental state, not the mental state of the direct perpetrator. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 845–846; *McCoy*, *supra*, 25 Cal.4th at pp. 1121–1122.) An aider and abettor's liability "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*McCoy*, at p. 1117, emphasis in original.)

9

Just as the aider and abettor of attempted voluntary manslaughter must have had an independent intent to kill, he must also have reacted in a heat of passion that would have mitigated his intent to kill.  Neither Calixto's account of the incident nor Martinez's account amounts to substantial evidence that Martinez reacted to Calixto's behavior in the heat of passion.

*A. Objective Component*

"A heat of passion theory of manslaughter has both an objective and a subjective component."  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  The objective component requires that the defendant's "heat of passion must be due to 'sufficient provocation.'  [Citation.]" (*People v. Wickersham* (1982) 32 Cal.3d 307, 326 (*Wickersham*), overruled on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201.)  The victim's conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation or reflection."  (*Moye*, at p. 550.)

1. Insufficient provocation by either version

Calixto's behavior, as he described it at trial testimony, did not establish the sufficient provocation required for the objective component.  According to Calixto, Martinez initially made him feel uncomfortable by offering Valente to him.  Martinez also encouraged Calixto to grab Valente, and even forced Calixto's hand onto Valente's thigh.[5]  Each time, Calixto refused because he felt he did not know Valente well enough to engage in physical

---

[5]     Martinez argues that Calixto grabbed Valente's leg on his own.  At trial, Martinez attempted to impeach Calixto with his recorded statement to Deputy Rivera.  But in Calixto's testimony, he maintained that Martinez put his hand on Valente's leg.

contact. After Calixto's refusals, Valente attacked him with a bottle. Valente then instructed Martinez to grab Calixto. Martinez held Calixto down and Valente stabbed him repeatedly. Based on the order of events, they attacked Calixto because he refused to engage in physical contact with Valente. But Calixto's rejection of Valente was not sufficiently provocative to cause a person of average disposition to act rashly.

Martinez's version did not support the objective component either. In his interview with Detective Leyba and Deputy Rivera, Martinez claimed Calixto initiated the physical contact with hugs and attempts to climb on them. But these acts are not sufficient provocation. A technical battery or slight touching does not warrant an instruction on heat of passion. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.)

          2. Unreasonable provocation under section 192, subdivision (f)(1)

The prohibition against provocation related to a victim's sexual orientation in section 192, subdivision (f)(1) (subdivision (f)(1)) further supports our conclusion. It states that "the provocation was not objectively reasonable if it resulted from the discovery of, knowledge about or potential disclosure of the victim's actual or perceived . . . sexual orientation."[6] Pursuant to subdivision (f)(1), Calixto's behavior could not amount to objectively reasonable provocation.

The attack began after Martinez teased Calixto with the prospect of physical involvement with Valente. When Calixto refused, Martinez's teasing became physical. He grabbed

---

[6] Subdivision (f)(1) includes gender, gender identity, and gender expression in addition to sexual orientation.

Calixto's hand and placed it on Valente's thigh. Moments after Calixto refused again and withdrew his hand, they attacked him.

This prelude suggests that the attack resulted from Martinez's knowledge about Calixto's sexual orientation. Martinez either wanted Calixto to physically engage with Valente or was trying to humiliate Calixto because of his sexual orientation.[7] Either way, subdivision (f)(1) prohibits construing Calixto's acts of rejection as objectively reasonable provocation.

Martinez maintains that his version of the incident as told to Detective Leyba and Deputy Rivera supports attempted voluntary manslaughter because in that version, Calixto initiated the physical contact. But subdivision (f)(1) would still prohibit this alleged provocation.

Subdivision (f)(1) includes provocation that resulted from the discovery of, knowledge about, or potential disclosure of the victim's sexual orientation under "circumstances in which the victim made an unwanted nonforcible romantic or sexual advance towards the defendant." In other words, the provocation is still unreasonable even if the defendant discovered, knew about, or potentially disclosed the victim's sexual orientation because he made a nonforcible advance toward him.

In Martinez's version, Calixto hugged Valente and him, climbed on them, and grabbed Valente's leg. Calixto also told Valente that he liked him. But at most, Calixto's alleged acts were unwanted romantic advances and Valente attacked him in

---

[7]     In his interview, Martinez tried to deny that he helped Valente because of Calixto's sexual orientation. Martinez stated that he "didn't . . . think [he] did it because of that." The uncertainty in Martinez's answer, as well as the acts leading up to Valente's attack, prevents viewing it as a firm denial.

response to them.  These circumstances rendered the alleged provocation objectively unreasonable pursuant to subdivision (f)(1).

Martinez argues that subdivision (f)(1) does not apply because in his version, Calixto's behavior constituted forcible, not nonforcible, romantic advances toward Valente and him.  We disagree.

According to Martinez, Calixto's persistent advances despite their rejections constituted forcible acts.  But Martinez incorrectly equates unwanted touching with forcible touching.  The statute includes advances that were unwanted.  (§ 192, subd. (f)(1).)  Even assuming Martinez's version is true, the alleged acts were unwanted.  But they were not forcible.

In the context of forcible rape, the Supreme Court stated that the term forcible considers whether "the use of force served to overcome the will of the victim to thwart or resist attack." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1027.)  It does not consider whether the force physically facilitated sexual penetration (*ibid*.) or "whether the [use of force] overcame [the victim's] physical strength or ability to resist [the perpetrator.]" (*Id*. at p. 1028; *People v. Hale* (2012) 204 Cal.App.4th 961, 979 [applying same definition to forcible sodomy, requiring "enough physical force to overcome the victim's will"].)

Again, assuming Martinez's version to be true, Calixto merely attempted to hug and climbed on top of Valente and him. The attempted hugs and climbing did not overcome Valente's nor Martinez's will to thwart or resist attack.  Without question, Calixto never tried to restrain Martinez or Valente, or use force to overpower them.  When instructed to calm down, Calixto complied.  By no stretch of the imagination could Calixto's acts

13

with his immediate compliance to withdraw constitute forcible acts, especially against two adult men who ably overpowered him. This determination that Calixto's alleged advances were nonforcible further renders any provocation objectively unreasonable under subdivision (f)(1).

   *B. Subjective Component*

   The subjective component for attempted voluntary manslaughter under a heat of passion theory requires the defendant acting while under the influence of a strong passion induced by the provocation. (*Moye*, *supra*, 47 Cal.4th at p. 550; *Wickersham*, *supra*, 32 Cal.3d at p. 327.) "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge [citation].' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

   Martinez did not act under the influence of any strong passion when he held Calixto down. He expressed uncertainty when asked about his reason for holding Calixto down. Martinez stated, "I don't know, instinct, maybe." On appeal, Martinez highlights his use of the word "instinct" in his response to Deputy Rivera's question about why he held Calixto. But his tentative language hardly expressed strong emotion. Also, in the context of his response, Martinez appeared to have suggested that he helped Valente out of an instinct to assist a family member.[8] In no way did Martinez express that he reacted to Calixto's behavior out of an emotional instinct.

---

[8]   When Deputy Rivera sought clarification, asking if he held Calixto down because Valente is his cousin, Martinez stated, "I think so."

14

At one point in the interview, Martinez offered no reason for being angry at Calixto. He acknowledged that Calixto complied with his request to calm down and not engage in any additional physical contact with him. By contrast, Martinez said Valente remained angry because Calixto proceeded to engage with him.

No evidence, substantial or otherwise, supported the subjective component of voluntary manslaughter based on heat of passion for Martinez. Along with the lack of evidence to support the objective component, this deficiency leads us to conclude that the trial court properly denied an instruction on voluntary manslaughter.

## II. Voluntary Absence From Trial

Martinez argues that the trial court improperly proceeded with the jury trial in his absence. He first complains that the trial court violated his right to be present at trial by incorrectly finding him voluntarily absent. He also asserts that proceeding in his absence violated his federal constitutional right to a fair trial.

### A. Additional Background

On Monday, May 2, 2022, the court commenced the trial with jury selection and impaneled a jury. At the end of the day, the court stated the next day would consist of preliminary instructions, opening statements, and witness testimony. The court announced that the trial would be in session in the afternoon on the next day, but not in the morning. The court added that the trial would be in session all day on Thursday and Friday. Martinez was present for this announcement as well as the entire day of jury selection.

On May 3, 2022, Martinez was absent for trial. Sheriff's Deputy Ramone Alvarez, the bailiff for the courtroom, recounted his efforts to determine what happened with Martinez. At approximately 8:30 a.m., Deputy Alvarez confirmed with a deputy in the Alhambra courthouse lockup that Martinez was not transported. Deputy Alvarez next checked the Sheriff's Department inmate tracking system, which indicated that Martinez's wristband had not been scanned and he was not in line to be transported to court. The booking number system used by the Los Angeles Superior Court indicated Martinez had a court appearance for May 3, 2022.

At 9:05 a.m., Deputy Alvarez contacted someone named Deputy Martinez[9] at module 3400 of the Men's Central Jail, where Martinez was housed. Deputy Martinez stated that Martinez refused to go to court. At 10:15 a.m., Deputy Alvarez called Deputy Martinez again and requested that he ask Martinez if he would go to court. Soon after, Deputy Martinez reported that Martinez said he would go to court.

---

[9] Martinez, Deputy Martinez from module 3400 at Men's Central Jail, and Senior Deputy David Martinez from the Alhambra courthouse share the same last name. To avoid confusion, we will refer to the person who worked at the jail as Deputy Martinez and the person who worked at the Alhambra courthouse as Senior Deputy Martinez.

In his Opening Brief and Reply Brief, Martinez confuses Deputy Martinez for Senior Deputy Martinez, describing him as "the deputy in the courthouse lockup." Deputy Alvarez contacted Deputy Martinez at module 3400 and learned Martinez refused to go to court.

At 11:30 a.m., Deputy Alvarez contacted Custody Assistant Munoz,[10] who informed him that Martinez refused to go to court. At 11:45 a.m., Deputy Alvarez confirmed with someone named Sergeant Estrada that Martinez would not go to court. Sergeant Estrada helped provide Deputy Alvarez with a Sheriff's Department Inmate Court Refusal form.

An Inmate Court Refusal form was generated for Martinez. The form was dated May 3, 2022, with a time of 9:05 a.m. In the box for "Reason for Refusal," the form stated, "per Deputy Torres inmate refused to exit his cell for court this morning. Refusal." The box for "Court Deputy Contacted" was blank. Next to that box was a box for "Employee #" with the number "654190" listed. The box for "Court Deputy Notified at" is blank. The "Custody Verification Person" listed was "Officer Fernandez" with the "Unit" listed as "IRC."

Defense counsel requested additional time to go to the jail to meet with Martinez before the court found he had voluntarily absented himself. He added that in previous conversations, Martinez said he wanted his trial to go forward. He also suggested that Martinez might have slept longer because the trial was not scheduled to start until the afternoon.

The trial court stated that Martinez's initial refusal was followed by his agreement to go to court. Martinez refused again, despite the agreement. This history demonstrated to the court that Martinez was "just playing games with the deputies." The court also mentioned that Martinez had prior experience with the

---

[10] As determined later, Deputy Alvarez incorrectly used the title of deputy for Custody Assistant Munoz.

criminal justice system, including incarceration in the county jail, and "knows how it works."

The court further stated that on the previous day, he observed Martinez engage in inappropriate behavior. Martinez was laughing in the courtroom and "talking and smiling and almost like he was cracking jokes." The bailiff added that during the proceedings in the courtroom, on multiple occasions, Martinez made comments to him in Spanish about the court reporter and other women present in the courtroom. These comments had sexual connotations. The court stated that Martinez's behavior in court was "consistent with somebody who is taking this lightly and he's going to possibly play games with the system. And it appears that's what he's doing."

Defense counsel agreed that Martinez's courtroom behavior was inappropriate at times. But defense counsel repeated his request to wait for more information about the circumstances of Martinez's refusal.

The court denied the request. Relying on the information provided, the court found Martinez voluntarily absented himself within the meaning of section 1043, subdivision (b)(2). The court announced that trial would proceed in Martinez's absence, even though the duration of the day's proceedings would be less than three hours. The court did not want Martinez to disrupt the trial.

B. *Motion for New Trial and Additional Witnesses and Evidence*

After the jury convicted Martinez, he moved for a new trial based on the court violating his right to be present at trial. Both Martinez's motion and the District Attorney's opposition referenced surveillance video that depicted jail personnel

18

stopping briefly in front of Martinez's cell at 10:36 a.m. and 11:03 a.m.

Martinez also attached a declaration of the events that occurred on the date he was absent. Martinez claimed that between midnight and 9:05 a.m., no deputy talked to him about going to court. He stated that "[m]ost of the deputies ignored [him] as they walked by." Martinez further stated that a deputy later asked him why he had not gone to court. After Martinez explained that no one came for him, the deputy suggested it was his fault and never gave him the opportunity to go to court.

### 1. Custody Assistant Munoz

At the hearing on the motion, Custody Assistant Gabriel Munoz[11] testified. He worked in that capacity for almost 17 years. CA Munoz testified that at about 3:00 a.m. or 4:00 a.m., inmates are generally notified that they are going to court. At 5:00 a.m., the inmates are ordered out of their cells and the gates are opened. If they are compliant, they are placed in the court transportation line and then transported to their respective courthouse. CA Munoz testified that he has no incentive to fail to transport an inmate who has a scheduled court date and wants to go to court.

CA Munoz identified himself in the surveillance video as the person stopping in front of Martinez's cell at 11:03 a.m. But he did not independently remember Martinez or the contact with him. CA Munoz could not identify the person depicted in front of Martinez's cell at 10:36 a.m.

---

[11] Martinez's Opening Brief incorrectly refers to Gabriel Munoz as Vincent Munoz. We refer to him as CA Munoz.

## 2. Senior Deputy Martinez

Senior Deputy David Martinez testified that he supervised other deputies and oversaw the day-to-day operations at the Alhambra courthouse. His job required him to be aware of which inmates made it to court each day. He explained that not all inmates ordered to the courthouse arrive. He said the most common reason for inmates not going to court is they refuse. Senior Deputy Martinez testified that on the date of Martinez's absence, 11 inmates arrived at the Alhambra courthouse, even though 31 inmates were scheduled to appear.

## 3. Deputy Torres

Deputy Miguel Torres testified that he worked at Men's Central Jail, where he would handle, house, escort, and serve meals to inmates, among other duties. He was working a shift from 10:00 p.m. on May 2, 2022, to 6:00 a.m. on May 3, 2022. Each day at 3:00 a.m., he would receive an emailed list of inmates in the module who are scheduled to appear in court for the day. At 5:00 a.m., a deputy or custody assistant for each module would announce the names of those inmates on the public address system. These inmates would be instructed to get ready. The gates would be opened and inmates either go to court or refuse to go to court. The morning shift of jail personnel would begin at 6:00 a.m. Those assigned to the morning shift would escort the inmates who came out of their cells to the court line at 6:30 a.m. to 7:00 a.m. Deputy Torres described this typical morning process as fast paced with little contact between jail personnel and inmates.

If an inmate did not step out of his cell for court, he would be documented as a refusal. Deputy Torres said that usually a deputy or officer at the Inmate Reception Center fills out the

Inmate Court Refusal Form. At the Inmate Reception Center, a custody assistant or deputy would keep track of the inmates who refused. That person would provide refusal forms to courts upon request.

If an inmate initially refused to go to court, he could still go to court later if he changed his mind. Deputy Torres explained the ease of escorting an inmate to the court transportation line. A deputy would conduct safety checks of the inmates at 30-minute intervals. An inmate who previously refused to go to court could inform this deputy that he changed his mind and wanted to go to court. Deputy Torres never refused to escort an inmate to the court transportation line. He believed that assisting inmates to get to court would prevent possible hostility he may face from them for missing their court dates.

Deputy Torres discussed the procedure for inmates housed in the discipline row known as "34 Charlie," or "34 C-Row." These inmates would be handcuffed and escorted from the row to the Inmate Reception Center court lines. A deputy would handcuff the inmate through a tray slot in the gate before it opened. He added that the deputies on the morning shift would escort these inmates to the court line. Deputy Torres's shift typically ended before these inmates would be escorted.

Deputy Torres testified that he did not have contact with Martinez on May 3, 2022. Deputy Torres's shift on May 3, 2022, ended at 6:00 a.m., before the inmates in module 34 C-Row would have been escorted out of their cells. A deputy who worked the next shift from 6:00 a.m. would escort these inmates to the court line. Deputy Torres testified that no deputy went to Martinez's cell to open the gate, handcuff him, and take him to the court line

21

before his shift ended at 6:00 a.m. Deputy Torres did not know if another deputy made such an attempt after 6:00 a.m.

Deputy Torres believed he was listed on Martinez's refusal form. The only employee number listed on the form did not belong to Deputy Torres.[12] He denied having personal contact with CA Fernandez about Martinez refusing to go to court. Deputy Torres did not know why CA Fernandez included the information about him. Deputy Torres said that usually a deputy or officer at the Inmate Reception Center fills out the form. CA Fernandez completed the form for Martinez.

Deputy Torres did not personally know nor have an independent memory of Martinez. Deputy Torres had no incentive or motive to misrepresent the facts to which he testified at the hearing.

### 4. Custody Assistant Fernandez

Custody Assistant Victor Fernandez testified that on May 3, 2022, he was assigned to the Court Refusal Team. In this capacity, he worked as a liaison between the Sheriff's Department and the courts to see which inmates were transported to court and which inmates were not.

CA Fernandez explained that at the beginning of his shift at 6:00 a.m., he would receive a list of inmates who were not transported to their respective courthouses. The list would be an electronic spreadsheet that contained the information that he would use to complete the Inmate Court Refusal form, including

---

[12] Only one box for "Employee #" is on the Inmate Court Refusal form. This box is located next to the "Court Deputy Contacted" box. Presumably, the number in this box for Martinez's form belonged to Deputy Alvarez who was the court deputy.

the inmate's name, booking number, court destination, and information about the deputy to whom the inmate refused. CA Fernandez testified that he had no reason to misrepresent the facts when he completed the Inmate Court Refusal forms.

If information was missing from the list, CA Fernandez would call the deputy assigned to the floor where the refusing inmate was housed. He would request that the inmate be transported to court. If the inmate continued to refuse, CA Fernandez would obtain the deputy's information. If the deputy worked the earlier shift, prior to CA Fernandez starting his shift, he would rely only on the information in the list to complete the Inmate Court Refusal form.

CA Fernandez testified that he would also receive phone calls from courts requesting specific inmates who had not yet arrived. CA Fernandez would determine the housing for the inmate and ask the deputy at the location if the inmate would make it to court. When the inmate refused again, CA Fernandez would obtain the deputy's name and employee number to note on the Inmate Court Refusal form. CA Fernandez would not have personal contact with the refusing inmates. If a court made a second request to get the inmate, CA Fernandez would again contact the floor where the inmate was housed. If the inmate refused again, that information would be relayed to CA Fernandez, who would relay it to the court.

CA Fernandez confirmed that he completed the Inmate Court Refusal form for Martinez. He could not confirm that he received the information regarding Martinez's refusal from Deputy Torres or from the emailed spreadsheet. CA Fernandez further confirmed that he did not personally speak with Martinez.

### 5. Judicial assistant's text messages

Within about 15 minutes of the deputy's 10:36 a.m. contact with Martinez, the trial court's judicial assistant sent a text message to the attorneys informing them that Martinez agreed to be transported. At 11:25 a.m., 12 minutes after CA Munoz's contact with Martinez, the judicial assistant sent another text message to the attorneys. This message stated that Martinez again refused to go to court. Defense counsel did not dispute the accuracy of the text messages.

### C. *Voluntary Absence as a Waiver for the Right to be Present*

The federal and state constitutions provide a criminal defendant with the right to be personally present with counsel. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*).) Section 977, subdivision (b)(1) also provides that in felony cases, the defendant shall be present "at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence." The defendant has the right to be present at all other proceedings, unless he executes a written waiver. (*Gutierrez*, at pp. 1202–1203.) Section 1043, subdivision (a), also mandates that the defendant in a felony case be personally present at trial. These statutory rights are coextensive with the constitutional right. (§ 977, subd. (c)(2)(B); *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 23.)

But the right to be present for trial is not absolute. (*Gutierrez, supra*, 29 Cal.4th at p. 1202.) A trial may continue to verdict in the absence of a defendant in a non-capital felony case after it has commenced in his physical presence if he is

24

voluntarily absent.  (§ 1043, subd. (b)(2); *Gutierrez*, at p. 1203.) When a defendant voluntarily absents himself, the trial court can continue with the trial and not allow him to " ' "intentionally frustrat[e] the orderly process of his trial." ' "  (*People v. Concepcion* (2008) 45 Cal.4th 77, 83 (*Concepcion*).)

1.  Standard of proof for voluntary absence

The right to presence may be explicitly or implicitly waived. (*People v. Ramirez* (2022) 14 Cal.5th 176, 188 (*Ramirez*).)  The trial court's finding of voluntary absence constitutes a sufficient implied waiver of a defendant's constitutional right to presence. (*Ibid.*; *Concepcion, supra*, 45 Cal.4th at pp. 82–83.)

To determine whether a defendant is voluntarily absent under section 1043, subdivision (b)(2), the trial court must consider the three-part test established by the United States Supreme Court in *Taylor v. United States*.[13]  (*People v. Espinoza* (2016) 1 Cal.5th 61, 74 (*Espinoza*); *Ramirez, supra*, 14 Cal.5th at p. 188.)  This three-part test includes whether " ' "it is clearly established" ' " that the defendant was " ' "aware of the processes taking place[,]" ' " was aware " ' "of his right and of his obligation to be present[,]" ' " and had " ' "no sound reason for remaining away." ' "  (*Ramirez*, at p. 188, quoting *Taylor*, at pp. 19–20, fn. 3.)

The Supreme Court has not settled on the standard of proof for a trial court's factual finding that the voluntariness of the defendant's absence was "clearly established."  (*Ramirez, supra*, 14 Cal.5th at p. 189.)  Most recently, in *Ramirez*, the Court assumed without deciding that the clear and convincing evidence standard applied, and concluded the standard was supported by

---

[13]     *Taylor v. United States* (1973) 414 U.S. 17, 19–20, and footnote 3 (*Taylor*).

25

the facts of the case. (*Ibid*.) The Court reasoned that *Taylor's* requirement that the three parts be "clearly established" by the evidence suggested a higher standard to protect the constitutional right to be present.[14] (*Id*. at p. 190.)

We too assume the clear and convincing evidence standard of proof applies to the trial court's determination. This standard requires "a high probability" that the defendant voluntarily absented himself. (*Ramirez, supra*, 14 Cal.5th at p. 190.)

### 2. Standard of review

We review the trial court's determination that the defendant was voluntarily absent for substantial evidence. (*Concepcion, supra*, 45 Cal.4th at p. 84; *Espinoza, supra*, 1 Cal.5th at p. 74; *Ramirez, supra*, 14 Cal.5th at p. 189.) Implementing the three-part test from *Taylor*, "we review the entire record to determine whether there is substantial evidence from which a reasonable fact finder could have found it highly probable that defendant was ' " 'aware of the processes taking place,' " that he knew of " 'his right and of his obligation to be present,' " and that he had " 'no sound reason for remaining away.' " ' " (*Ramirez*, at p. 190.) We " 'must view the record in the light most favorable to the [factfinder's finding] and give due deference to how the [factfinder] may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' [Citation.]" (*Ibid*.) We assess whether substantial evidence supported the

---

[14] The Court considered other applications of the clear and convincing standard when important individual rights are at issue, such as the termination of parental rights, involuntary commitment, and deportation. (*Ramirez, supra*, 14 Cal.5th at p. 189, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 999.)

court's finding of voluntary absence when it was provided with additional information for the motion for new trial. (*People v. Connolly* (1973) 36 Cal.App.3d 379, 385.)

    3. Substantial evidence of voluntary absence

Martinez argues that the trial court incorrectly found him voluntarily absent. He focuses on the lack of evidence to support CA Fernandez's allegation on the Inmate Court Refusal form that he refused to go court. Martinez specifically claims that the jail surveillance video did not depict anyone stopping in front of his cell prior to 10:36 a.m., after the form was generated at 9:05 a.m. He also points out that the form identified Deputy Torres as the person conveying the information about Martinez's refusal. But Deputy Torres denied this during his testimony at the motion hearing.

Whether Martinez refused prior to the generation of the form is unclear. Either Martinez is correct, and he never refused to anyone prior to 9:05 a.m., or he refused to someone after the morning shift ended based on the procedure described by Deputy Torres.[15]

---

[15]    If Martinez did refuse to someone, the contact either occurred during one of the times the video depicts a deputy walking by Martinez's cell, or it was not captured on the video. Either option remains plausible.

    First, in the motion for new trial, defense counsel chronicled 12 times in the video that depicted a deputy walking down the row between midnight and 10:00 a.m. These included the times of 5:06 a.m., 5:28 a.m., 6:17 a.m., 6:38 a.m., 6:57 a.m., 8:30 a.m., 8:40 a.m., 8:52 a.m., and 9:11 a.m. These events appear to be the safety checks of the inmates at 30-minute intervals to which Deputy Torres referred. Martinez could have informed one of these deputies that he was refusing to go to

We need not resolve the discrepancy between CA Fernandez's identification of Deputy Torres as the person who communicated information about Martinez's refusal and Deputy Torres's testimony that he never observed Martinez refuse. Even if CA Fernandez made a mistake, we must assess the "record as a whole" for sufficient evidence of voluntary absence. (*Ramirez*, *supra*, 14 Cal.5th at p. 190.) We cannot ignore the other evidence on which the court relied.

First, Deputy Alvarez testified about information he received from CA Munoz at 11:30 a.m. that Martinez refused after the Inmate Court Refusal form was generated by CA Fernandez. The trial court relied on this information in finding Martinez voluntarily absent.

Second, the video evidence supports the information discovered by Deputy Alvarez. As Martinez concedes, the video evidence showed that jail personnel spoke to him at least two

_____

court. In his declaration, Martinez acknowledged that he spoke with these deputies, even though he claimed they ignored his requests to go to the Court line.

Second, the record also does not definitively rule out whether jail personnel could have been positioned in a place not captured by the surveillance video camera and still communicated with Martinez while he was inside his cell. The photos attached to the motion represented the surveillance video depicting Cell 4 on one side of the image, extending down past Cell 6, which was Martinez's cell. It is unclear whether a person could have communicated with Martinez while standing to the right of Cell 4, out of view of the video camera. This limitation of the video left open the possibility that Martinez did refuse to go to court prior to 9:05 a.m.

times later.[16] The video evidence at 10:36 a.m. and 11:03 a.m. corroborated the information that Deputy Alvarez and the court's judicial assistant learned about Martinez agreeing and later refusing to go to court.[17] First, the video depicted a deputy with a clipboard stopping in front of Martinez's cell. Presumably, this was Deputy Martinez, the person to whom Deputy Alvarez spoke about asking Martinez if he would go to court. Second, in the video, when CA Munoz arrives at the cell, Martinez is not escorted out. Martinez also does not place his hands through the tray slot to be handcuffed. Soon after, CA Munoz notified Deputy Alvarez about Martinez refusing.

The video evidence depicting CA Munoz interacting with Martinez at 11:03 a.m. supports the information learned by Deputy Alvarez at 11:30 a.m. No evidence sufficiently disputes that CA Munoz's contact with Martinez included anything but his refusal to go to court. The members of the jail personnel, including CA Munoz, also testified consistently that a willing inmate would never be refused transportation to court. The court determined that none of the witnesses falsely represented that Martinez would refuse to come to court.

The two contacts by jail personnel depicted in the video also refuted Martinez's claim that he was contacted only one time by a deputy to whom he made a request to go to court. The trial court reasonably discredited Martinez's version based on this video

---

[16]     At the hearing for the motion for new trial, defense counsel conceded the depiction of the 10:36 a.m. contact.

[17]     At 11:45 a.m., Deputy Alvarez also confirmed Martinez's refusal with Sergeant Estrada. But the record does not indicate the source of Sergeant Estrada's knowledge.

evidence. (*People v. Hersom* (2024) 105 Cal.App.5th 497, 511–512 [concluding substantial evidence supported finding of voluntary absence based on evidence discrediting defendant's reason for not being transported to court, along with jail form noting his refusal].)

The totality of evidence supported all three parts of the *Taylor* test. First, having attended the first day of trial, Martinez was aware that trial was in progress. Second, Martinez's agreement to go to court at 10:36 a.m. prior to his refusal supports he was aware of the obligation to attend. Third, Martinez had no sound reason for his absence. No evidence suggested Martinez was medically compromised, ill, or physically unfit to be transported. He was provided with the opportunity to be transported to court. He simply refused. We conclude there was substantial evidence from which a reasonable fact finder could have found it highly probable that defendant voluntarily waived his right to be present on May 3, 2022. [18]

---

[18] For the same reason, we conclude the court did not abuse its discretion by denying Martinez's motion for new trial. (*Espinoza, supra*, 1 Cal.5th at pp. 75–76.)

Martinez does not specifically challenge the trial court's decision to proceed with the trial in his absence. (*Espinoza, supra*, 1 Cal.5th at p. 75.) We note that considerable effort and time went into reaching the stage of trial when Martinez was absent, beyond those typically encountered, such as expending resources and inconveniencing jurors and witnesses. (*People v. Granderson* (1998) 67 Cal.App.4th 703, 708.) Martinez was arraigned on the information on April 26, 2019. At one point, the court continued the case pursuant to a general order issued by the Los Angeles Superior Court Presiding Judge based on the Covid-19 pandemic. Martinez was also quarantined in the jail

30

### D. *No prejudice*

Martinez argues that his absence in the trial was prejudicial because he lost the opportunity to assist his attorney during Calixto's cross-examination.[19] Specifically, Martinez asserts that he "could have advised defense counsel regarding points of . . . [Calixto's] testimony that conflicted with [his] recollection," including questions about making physical advances toward Valente and him and telling Valente he liked him. Martinez believes that if he were present, he could have "guided defense counsel away from" portraying the attack as unexpected rather than instigated by Calixto's physical advances. He maintains that his assistance would have resulted in the court instructing on attempted voluntary manslaughter.

We reject Martinez's argument. Martinez was absent from the court's preliminary instructions, opening statements by

---

due to Covid exposure on at least two occasions. By May 3, 2022, the court had already impaneled the jury and alternate jurors. At least one of the sworn jurors raised concerns about scheduling conflicts and asked to be excused. Calixto appeared and was ready to testify. The court also considered Martinez's game-playing, including his vacillating between agreeing to go to court and refusing and his inappropriate comments about court staff members. The totality of the circumstances supported the court's decision to avoid risking hardship to the jury, inconveniencing witnesses, and disrupting the proceedings. (*Espinoza*, at p. 78.)

[19] Martinez does not suggest the jury found him guilty because he was absent. The trial court instructed the jury not to consider Martinez's absence for any purpose. The jurors were presumed to have followed this instruction. (*People v. Prince* (2007) 40 Cal.4th 1179, 1295.) Martinez does not argue otherwise.

31

counsel, direct examination of Calixto, and 27 minutes of cross-examination.  Calixto resumed his testimony on May 5, 2022[20] when Martinez was present in the courtroom.  Defense counsel subjected Calixto to extensive cross-examination for the entire morning, including questions about alleged physical advances toward Martinez and Valente and his prior statement about touching Valente's leg.  Nothing in the record suggests Martinez would have been able to assist or "guide" defense counsel in any particular manner.  He speculates that eliciting this testimony on the second day of testimony, instead of the first, would have caused Calixto to testify differently or persuaded the trial court to instruct on attempted voluntary manslaughter.  Even assuming the trial court's finding of Martinez's voluntary absence or proceeding with trial in his absence was incorrect, neither decision was prejudicial under any standard.[21]

---

[20]     The court was not in session on May 4, 2022.

[21]     A violation of the right to presence as established by sections 977 and 1043 is a state law error and is reversible if it is reasonably probable that a more favorable result would have resulted in the absence of the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Because Martinez also argues that his federal constitutional right to a fair trial was violated, prejudice is evaluated under the harmless beyond a reasonable doubt standard as established by *Chapman v. California* (1967) 386 U.S. 18, 23.

**DISPOSITION**

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**

                                        HANASONO, J.*


We concur:



        EDMON, P. J.



        EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.